845 A.2d 720 (2004)
368 N.J. Super. 237
Bonnie GERSHON, ADMINISTRATRIX AD PROSEQUENDUM FOR the ESTATE of Eugene J. PIETROLUONGO, Plaintiff-Respondent,
v.
REGENCY DIVING CENTER, INC. and Costas Prodromou, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued February 2, 2004.
Decided April 12, 2004.
*722 Judith A. Wahrenberger argued the cause for appellants (Wahrenberger & Pietro, and William J. Turbeville, II, admitted pro hac vice, attorneys; Ms. Wahrenberger and Mr. Turbeville, on the brief).
Michael J. Barrett, Woodbridge, argued the cause for respondent (Wilentz, Goldman & Spitzer, attorneys; Mr. Barrett, of counsel and on the brief).
Before Judges WEFING, COLLESTER and FUENTES.
*721 The opinion of the court was delivered by FUENTES, J.A.D.
In this appeal we are asked to decide whether an exculpatory release, executed by decedent as a condition of receiving scuba diving instructions from defendants, precludes decedent's heirs from bringing a wrongful death action pursuant to N.J.S.A. 2A:31-1 to -6. This is an issue of first impression in this State.
This issue was originally considered by the Law Division by way of cross-motions for partial summary judgment. The court granted plaintiff's motion striking defendants' affirmative defense based on the exculpatory release as it pertained to the wrongful death action, and granted defendants' cross-motion dismissing decedent's survivorship claim. We granted defendants' motion for leave to appeal.
We now hold that a release signed by decedent with the express purpose of barring his potential heirs from instituting a wrongful death action in the event of his death in connection with his underwater diving activities did not legally extinguish the potential heirs' rights to prosecute their statutorily authorized cause of action. Such exculpatory agreement is unenforceable and void as against public policy when it is invoked to preclude decedent's heirs from prosecuting a wrongful death action.
The core facts necessary to decide this matter are not in dispute.[1]

I
Decedent, Eugene Pietroluongo, died on July 17, 2001, while engaged in the recreational activity of scuba diving at the Dutch Springs Quarry located in Bethlehem, Pennsylvania. He was forty-four years old. Pietroluongo was an active scuba diver who participated in the sport since 1984. His diving pursuits increased as his marriage to Bonnie Sue Gershon ended in the late 1990s. The couple had *723 one daughter who was nine years old at the time of his death.
Decedent was also an attorney, admitted to practice in this State since 1983. He worked as an assistant prosecutor in the Office of the Essex County Prosecutor. Three days before his death, decedent sought out Regency Diving Center (RDC), located in the Township of Millburn, for advanced diving training. He informed RDC president and owner Costas Prodromou that he was certified by the Professional Association of Diving Instructors (PADI) as an Advanced Open Water Diver. Prodromou[2] suggested that decedent study Nitrox and Advanced Nitrox diving, which involves using various mixtures of oxygen-enriched air while diving.
Decedent executed a release agreement in connection with the prospective dives. The agreement stated in pertinent part:
I understand and agree that neither my instructor(s) Costas Prodromou, the facility through which I received my instruction, Regency Diving Center, Inc., International Training, Inc. and Technical Diving International, nor the officers, directors, shareholders, affiliated companies, employees, agents, or assigns of the above listed entities and/or individuals, nor the authors of any materials including texts and tables expressly used for training and certification (hereinafter referred to as "Released Parties") may be held liable or responsible in any way for any injury, death, or other damages to me or my family, heirs, or assigns that may occur as a result of my participation in this diving class or as a result of the negligence of any party, including the Released Parties, whether passive or active.

....
IT IS THE INTENTION OF Eugene J. Pietroluongo BY THIS INSTRUMENT TO EXEMPT AND RELEASE MY INSTRUCTORS, Costas Prodromou (AND OTHERS, ______,) THE FACILITY THROUGH WHICH I RECEIVED MY INSTRUCTION Regency Diving Center, THE TRAINING AGENCY Regency Diving Center AND INTERNATIONAL TRAINING, INC., AND TECHNICAL DIVING INTERNATIONAL, AND ALL OTHER RELATED ENTITIES AND RELEASED PARTIES AS DEFINED ABOVE, FROM ALL LIABILITY OR RESPONSIBILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE OR WRONGFUL DEATH HOWEVER CAUSED, OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, INCLUDING, BUT NOT LIMITED TO, THE NEGLIGENCE OF THE RELEASED PARTIES, WHETHER PASSIVE OR ACTIVE. I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS LIABILITY RELEASE AND EXPRESS ASSUMPTION OF RISK BY READING IT BEFORE SIGNING IT ON BEHALF OF MYSELF AND MY HEIRS.
A separate medical history form indicated that decedent took medication for high blood pressure. He presented Prodromou with a physician-signed approval for diving.
On July 17, 2001, decedent, Prodromou, RDC scuba instructor John Berghoefer and student Paul Kulavis met in Pennsylvania for a preliminary dive intended to ascertain the student divers' skill levels. Berghoefer was to lead the group, with decedent and Kulavis positioned in the *724 middle and Prodromou in the rear. The group swam along the surface of the water and then began their descent, exchanging thumbs up "okay" signals along the way. There was clear visibility and good weather conditions.
The group swam first to one submerged platform, and then to another, spaced about fifty feet apart. Prodromou waited for Kulavis to catch up with decedent and Berghoefer as they headed toward the third platform. As they proceeded, he noticed that Berghoefer had missed the platform. The other divers, including decedent, followed Berghoefer. Prodromou swam straight for the platform to redirect the group. Berghoefer, realizing his mistake, turned around and headed back toward Prodromou and the platform. Decedent and Kulavis followed.
At this point Prodromou looked toward decedent's and Kulavis's former locations, but only saw a cloud of silt. He and Berghoefer immediately swam toward this location. Berghoefer reached the area first and led the distressed Kulavis from the area. In his panic, Kulavis had embedded himself in the mud at the bottom of the quarry, erroneously pressing the deflate button on his buoyancy compensator instead of the inflate button. He kicked up the cloud of silt as he struggled with a loose fin and control of his buoyancy.
Berghoefer and Prodromou brought Kulavis to the surface and in so doing lost sight of decedent. Prodromou looked for decedent's air bubbles and asked Kulavis about decedent's location. According to Kulavis, decedent, noticing Kulavis's struggle, motioned for him to stay in place while he swam from the cloud of silt, presumably to alert the instructors.
Prodromou descended again and searched the cloud of silt to no avail. He then returned to the surface in accordance with the "lost buddy" protocol which calls for divers to surface within one minute of being separated from their companions. Prodromou also asserted that, as an Advanced Open Water Certified Diver, decedent should have been aware of this procedure. When decedent did not surface, Prodromou swam to shore to summon help and begin the search. Decedent's body was eventually located the next evening in sixty-six feet of water with an ample supply of air in his tank and equipment in working order. The medical examiner ruled his death an accidental drowning.

II
The Law Division held that the exculpatory release signed by decedent barred any survivorship claim which may have been asserted by his estate pursuant to N.J.S.A. 2A:15-3, but did not legally preclude an independent wrongful death action brought by decedent's heirs, who had not signed the agreement. Defendant, relying on Madison v. Superior Court, 203 Cal.App.3d 589, 250 Cal.Rptr. 299 (1988), an appellate court decision from California, argues that the release operates as a complete bar to all claims in connection with decedent's voluntary recreational diving activities, including a wrongful death action.
The facts in Madison are strikingly similar to the facts here. Decedent signed a release purporting to waive, for himself, his heirs, executors and assigns "any and all actions or causes of action for personal injury, property damage or wrongful death" as a condition of participating in scuba diving classes. Id. at 302.
Although the Madison Court concluded that decedent had no power or right to *725 waive his heirs' wrongful death action,[3] it paradoxically held,
that a plaintiff in a wrongful death action is subject to any defenses which could have been asserted against the decedent, including an express agreement by the decedent to waive the defendant's negligence and assume all risks. In other words, a distinction must be made between the legal ineffectiveness of a decedent's pre-injury release of his heirs's [sic] subsequent wrongful death action and the legal effectiveness of an express release of negligence by a decedent which provides a defendant with "a complete defense."

[Id. at 303-04 (emphasis added) (citation omitted).]
In our judgment, the holding in Madison is internally inconsistent and cannot be rationally integrated into New Jersey's wrongful death jurisprudence.
We will begin our analysis by emphasizing that the Wrongful Death Act is remedial legislation and must be liberally construed to effectuate its purpose of creating a right of recovery for the economic loss caused by the death of a family member. LaFage v. Jani, 166 N.J. 412, 430, 766 A.2d 1066 (2001); Smith v. Whitaker, 160 N.J. 221, 232, 734 A.2d 243 (1999); DeFelice v. Beall, 274 N.J.Super. 592, 599, 644 A.2d 1136 (App.Div.), certif. denied, 138 N.J. 268, 649 A.2d 1288 (1994). The class of litigants in a wrongful death case often includes minor children, dependent upon the decedent for economic support. Kibble v. Weeks Dredging & Const. Co., 161 N.J. 178, 189, 735 A.2d 1142 (1999).
The section of the Wrongful Death Act relevant here provides that:

When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime.
[N.J.S.A. 2A:31-1 (emphasis added).]
The emphasized language limiting the right to bring a wrongful death claim only in situations in which the decedent, had he or she lived, would have been entitled to bring an action for damages, pertains only to the character of the injury, and is not intended as a procedural or jurisdictional requirement. Miller v. Estate of Sperling, 166 N.J. 370, 382, 766 A.2d 738 (2001). Thus, in Miller, the Supreme Court permitted decedent's heirs to *726 bring a wrongful death claim even though the survivorship action was barred by the statute of limitations. In so doing the Court explained that:
A claim for wrongful death is independent of a claim for malpractice. We interpret the statutory language [in N.J.S.A. 2A:31-1] to refer only to the character of the injury, and not to require a viable personal injury cause of action as a condition precedent to maintaining a wrongful death claim. Decedent's failure to file an action in her lifetime does not bar the death action. We conclude that plaintiff's right to file the wrongful death claim outweighs defendant's interest in repose, in light of the overarching need to preserve rights established by the Legislature for those who survive a decedent. A different result not only conflicts with the language of the Act, but could extinguish a wrongful death action even before it came into existence. We reject such a result.
[Id. at 386-87, 766 A.2d 738 (citation omitted).]
A wrongful death action can only be brought for the benefit of decedent's heirs. N.J.S.A. 2A:31-4. The action is commenced by either an administrator ad prosequendum of the decedent or an executor, if the decedent dies testate. N.J.S.A. 2A:31-2. As a matter of law, a wrongful death action does not accrue to the decedent. Miller v. Estate of Sperling, supra, 166 N.J. at 383-84, 766 A.2d 738.
Thus, although actions brought under the Survivor Act and the Wrongful Death Act arise from the death of the decedent, "they serve different purposes and are designed to provide a remedy to different parties." Smith v. Whitaker, supra, 160 N.J. at 231, 734 A.2d 243. Wrongful death damages are intended to compensate the statutorily recognized class of claimants for the pecuniary losses caused by the death of the decedent as a result of the tortious conduct of others. "The Survivor Act preserves for the decedent's estate `any personal cause of action that decedent would have had if he or she had survived.'" Vassiliu v. Daimler Chrysler Corp. 178 N.J. 286, 294, 839 A.2d 863 (2004) (quoting Galante v. May, 364 N.J.Super. 284, 288, 835 A.2d 352 (App. Div.2003)). See also F.F. v. G.A.D.R., 331 N.J.Super. 23, 28, 750 A.2d 786 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000).

III
The law does not favor exculpatory agreements because they encourage a lack of care. Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 580, 111 A.2d 425 (App.Div.1955). An exculpatory release agreement, like any contract, can only bind the individuals who signed it. Goncalvez v. Patuto, 188 N.J.Super. 620, 628, 458 A.2d 146 (App.Div.1983). However, because such an agreement seeks from one party the relinquishment of a legal right, thereby relieving the other party of its common law duty of care, an exculpatory release agreement must, on its face, reflect the unequivocal expression of the party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences. Knorr v. Smeal, 178 N.J. 169, 177, 836 A.2d 794 (2003); Country Chevrolet, Inc. v. Township of N. Brunswick Planning Bd., 190 N.J.Super. 376, 380, 463 A.2d 960 (App.Div.1983). Any doubts or ambiguities as to the scope of the exculpatory language must be resolved against the drafter of the agreement and in favor of affording legal relief. Ultimate Computer Servs. Inc. v. Biltmore Realty Co. Inc., 183 N.J.Super. 144, 443 A.2d 723, (App.Div.), certif. denied, 91 N.J. 184, 450 *727 A.2d 522 (1982) (upholding an exculpatory clause limited to commercial tenancies).
The release agreement here was signed by decedent and defendants. It can therefore only bind these parties. On its face the release only manifests decedent's intention to waive defendants' duty of care pertaining to his personal safety. In order for such a waiver to also apply to decedent's heirs, the agreement must manifest the unequivocal intention of such heirs to be so bound. The public policy underpinning the Wrongful Death Act requires that we narrowly construe any attempt to contractually limit or, as in this case, outright preclude recovery. Decedent's unilateral decision to contractually waive his right of recovery does not preclude his heirs, who were not parties to the agreement and received no benefit in exchange for such a waiver, from instituting and prosecuting a wrongful death action.
Defendants, again relying on Madison v. Superior Court, supra, nevertheless argue that the exculpatory release agreement executed by decedent as a condition of receiving diving instructions constitutes an express and complete assumption of risk, removing the otherwise applicable duty of care. If this is so, defendants argue, then such a release must also preclude the wrongful death action because defendants cannot be found negligent as a matter of law.
In Madison, the court held that an exculpatory release signed by decedent precluded his heirs from prosecuting a wrongful death action because under California law, "[f]or it to be valid and enforceable, a written release exculpating a tortfeasor from liability for future negligence or misconduct must be clear, unambiguous and explicit in expressing the intent of the parties." Madison v. Superior Court, supra, 250 Cal.Rptr. at 304.
In New Jersey, an exculpatory release will be enforced if (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable. Chemical Bank of New Jersey Nat. Ass'n v. Bailey, 296 N.J.Super. 515, 527, 687 A.2d 316 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997); Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc., 203 N.J.Super. 477, 482-83, 497 A.2d 530 (App.Div.1985).
Thus, although Madison may provide an accurate expression of the legal standard employed in California to determine the enforceability of exculpatory release agreements, New Jersey law differs because, in addition to determining whether an agreement was intentionally and freely entered into, a reviewing court must also consider whether enforcement of such an agreement would contravene any of the four policy considerations previously enumerated.
In adopting the Wrongful Death Act, our Legislature declared that a just society has both a moral and economic responsibility to ensure that those who are found civilly liable for the death of a person are required to compensate the heirs of that person for the pecuniary losses resulting from his or her death. As noted by Justice Stein in Kibble v. Weeks Dredging & Const. Co., supra, 161 N.J. at 189, 735 A.2d 1142, in many wrongful death cases the decedent was the "breadwinner" and the heirs are children, incompetents or those otherwise economically dependent on the decedent.
We are satisfied that enforcement of the exculpatory release agreement executed by decedent here would adversely affect the public interest intended to be *728 protected by the Wrongful Death Act, because it relieves the alleged wrongdoer from the legal responsibility of compensating decedent's heirs, thereby shifting this economic burden to public welfare agencies, willing family members or private charities. Under these scenarios, the intended beneficiaries of the Act are deprived of their statutorily authorized remedy merely to provide defendants with an environment from which to operate their business, apparently free from the risk of litigation. Such a prospect would directly undermine the remedial purpose of the Act. Stated differently, even if decedent had the legal authority to bargain away the statutory right of his potential heirs, society's interest in assuring that a decedent's dependents may seek economic compensation in a wrongful death action outweighs decedent's freedom to contract.

IV
Defendants' argument lacks merit even without these statutory impediments.
It is well settled that a person's heirs are not defined until the time of his or her death. Reese v. Stires, 87 N.J. Eq. 32, 35, 103 A. 679 (N.J.Ch.1917); In re Bartles, 33 N.J. Eq. 46 (1880). This fundamental tenet of the law of wills and estates is best expressed by the ancient maxim nemo est haeres viventis, "[n]o one can be heir during the life of his ancestor." Black's Law Dictionary 936 (5th ed.1979). See also 4 Page on Wills § 34.6 (Bowe-Parker rev.3d ed.1961). It is therefore legally impossible for an exculpatory agreement to bar the legal claims of a class of litigants that were not legally in existence at the time of its execution.
In Alfone v. Sarno, 87 N.J. 99, 432 A.2d 857 (1981),[4] the Court considered whether a judgment for damages in a personal injury suit brought by decedent during her lifetime precluded a later action for wrongful death on behalf of her heirs or dependents. The Court held that a wrongful death action may be brought if the recovery is tailored to avoid duplicating elements of damages which comprised or could have comprised the earlier personal injury judgment.
Alfone also addressed this issue of damages in the context of a personal injury action settled by decedent prior to her death. In this respect, the Court noted that "[a] valid written settlement agreement specifically reciting what losses were compensated [in the personal injury case] will be binding on the wrongful death parties on the issue of what damages can be claimed subsequently." Id. at 122, 432 A.2d 857 (emphasis added). The Alfone Court, however, expressly rejected the notion that a wrongful death action can be barred by such a release.
We recognize that our decision today may prevent insurance carriers from obtaining complete releases from all possible wrongful death claims, except perhaps by the inclusion in any such agreement of all persons who subsequently are determined to be wrongful death beneficiaries under N.J.S.A. 2A:31-4. The policy favoring settlement and finality of claims, cannot defeat *729 statutory rights created for the protection of survivors of one wrongfully killed.

[Id. at 123, 432 A.2d 857 (citations omitted).]
Our research has revealed only two New Jersey cases that have construed settlement agreements executed by decedents to resolve their personal injury claims as barring subsequent wrongful death actions instituted by their heirs. Garde v. Wasson, 251 N.J.Super. 608, 616, 598 A.2d 1253 (App.Div.1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992) and Libera v. Whittaker, Clark & Daniels, Inc., 20 N.J.Super. 292, 295, 89 A.2d 734 (Cty.Ct. 1952). We note, however, that the holding in Garde was disapproved by the Supreme Court in Kibble v. Weeks Dredging & Const. Co., supra, 161 N.J. at 189 n. 2, 735 A. 2d 1142. To the extent that Libera is inconsistent with our holding here, it is overruled.

V
From these legal principles we conclude that decedent did not have the legal authority to bargain away his heirs' statutory rights to institute a wrongful death action in exchange for the privilege of having defendants provide him with scuba diving instructions. To hold otherwise would directly undermine the legislative policy established by the Wrongful Death Act.
Affirmed.
NOTES
[1] The facts surrounding decedent's accident are taken from the records provided by defendant. Plaintiff, in her brief before us, reserved the right to challenge the accuracy and completeness of this record once discovery is complete.
[2] Prodromou is an instructor-trainer for Scuba Diving International and Technical Diving International (SDI/TDI) with over ten years of diving experience and twenty different instructor ratings.
[3] § 377.60 of the current California Code of Civil Procedure provides that

A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:
(a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.
(b) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents. As used in this subdivision, "putative spouse" means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.
(c) A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support.
[4] The central holding of Alfone was that settlement of a medical malpractice action during a decedent's lifetime would not bar a subsequent wrongful death action brought by the decedent's heirs. Within the course of his opinion in Alfone, Justice Pashman, writing for the Court, addressed the history of the Wrongful Death Act. Alfone v. Sarno, supra, 87 N.J. at 103-05, 432 A.2d 857. Justice Coleman, writing for the Court in LaFage v. Jani, supra, 166 N.J. at 434, 766 A.2d 1066, expressed a different historical analysis and conclusion. Nothing in LaFage detracts from the validity of Alfone's central holding, however, which remains, in our judgment, good law.